UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
KIMBERLY EVANS,                                          :

                    Plaintiff,                        :          10 Civ. 1838 (GWG)

   -v.-                                               :          OPINION AND ORDER

MICHAEL J. ASTRUE, Commissioner of                      :
Social Security,
                               :
                    Defendant.
-----------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

      Plaintiff Kimberly Evans, brings this action pursuant to 42 U.S.C. § 405(g) to obtain

judicial review of the final decision of the Commissioner of Social Security denying her claim

for disability insurance benefits under the Social Security Act.  The parties consented to this

matter being decided by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  The

Commissioner and Evans have moved separately for judgment on the pleadings pursuant to Fed.

R. Civ. P. 12(c).  For the reasons stated below, the Commissioner's motion is denied and

Evans's motion is granted.

I.      BACKGROUND

      A.     Administrative Proceedings

      Evans applied for disability insurance benefits on July 16, 2001, alleging that she had

been unable to work since February 18, 1991.  See Administrative Record (annexed to Answer,

filed July 14, 2010 (Docket # 6)) ("R.") at 95-98.  Evans is insured for benefits through

December 31, 1997.  R. 245.  Evans had previously been employed as an administrative assistant

for IBM Research.  R. 123.

Evans's application was denied on June 28, 2002, following a hearing before an Administrative Law Judge ("ALJ").  See R. 68-75.  Evans appealed, R. 76-78, and on December 23, 2003, the Appeals Council remanded the decision to the ALJ, R. 82-85.  A second hearing was held on May 6, 2005.  R. 222-35.  In a decision issued on June 15, 2006, the ALJ again denied Evans's application.  R. 11-18.  The Appeals Council rejected Evans's appeal, R. 3-7, and Evans filed a civil action seeking review of the Commissioner's decision in the Southern District of New York, see R. 254-57.  A stipulation and order of remand pursuant to sentence four of 42 U.S.C. § 405(g) was filed on March 26, 2007.  R. 256-57; Stipulation and Order of Remand, filed Apr. 5, 2007 (Docket # 6 in 06 Civ. 15167).  On May 17, 2007, the Appeals Council remanded the matter to the ALJ for an additional hearing.  R. 258-61.  An ALJ held a third hearing on April 24, 2008.  R. 407-32.  In an opinion issued on March 26, 2009, the ALJ denied Evans's application.  R. 244-53.  The Appeals Council denied Evans's request for review.  R. 236-38.

B.    Procedural History

On March 9, 2010, Evans filed the instant action seeking review of the third ALJ decision.  See Complaint, filed Mar. 9, 2010 (Docket # 1).  On September 17, 2010, the Commissioner filed a motion for judgment on the pleadings.  See Notice of Motion, filed Sept. 17, 2010 (Docket # 9); Com. Memo.  Evans responded with a cross-motion for judgment on the pleadings.  See Notice of Motion, filed Oct. 24, 2010 (Docket # 13); Memorandum of Law in Support of the Plaintiff's Motion for Judgment on the Pleadings, filed Oct. 24, 2010 (Docket # 14) ("Pl. Memo").  The Commissioner did not respond to Evans's motion.

2

C.        The Administrative Record

    1.        Medical Records

In February 1991, Evans underwent a "vacuum assisted vaginal delivery."  R. 146.  "At the time of delivery, [Evans] sustained a fourth degree laceration," causing her to become "incontinent of stool."  R. 146.  Evans was treated by Dr. David Weiss.  See R. 175.  On July 1, 1991, Dr. Weiss's notes indicate that Evans was having "difficulty controlling [her] sphincter." R. 184.  He referred Evans to Dr. Martin Cohen.  R. 159-60, 184.

On October 18, 1991, Evans met with Dr. Cohen.  R. 172, 174.  She reported incontinence, pain, and bleeding from the rectum since giving birth eight months earlier.  R. 174. During the examination, Evans stated that she was having two to three bowel movements per day.  R. 174.  After examining Evans, Dr. Cohen recommended that Evans undergo a sphincteroplasty as soon as possible.  R. 174.  On October 24, 1991, Evans informed Dr. Cohen that her family was moving to North Carolina and that she and her husband were concerned about her undergoing surgery prior to their move.  See R. 173.  She asked if Dr. Cohen could provide her with the name of a surgeon in North Carolina.  R. 173.

In November 1991, while Evans was still in New York, Dr. Arnold Berlin examined Evans and prepared a report for her malpractice suit against the doctor who had delivered her baby.[1]  In the report he described Evans as a "healthy 32 year old female who underwent a spontaneous vaginal delivery in February 1991" in which she "sustained a 3rd degree laceration

---

[1]  The suit settled in 1997 for $400,000.  See R. 215, 228.  The reports in the record by Dr. Martin Cohen, Dr. John Garbutt, Jr., and Dr. Richard U. Hausknecht were also prepared for that case.  See 153-56, 157-58, 170-71.

3

which was repaired." R. 139. He stated that after the delivery, Evans reported leakage of stool and flatus and told Dr. Berlin that she was "totally unaware of the passage of flatus." R. 139. Evans told Dr. Berlin that a general surgeon diagnosed her with fecal incontinence and placed her on "various bulk forming agents." R. 139. As a result, Evans reported that she was able to be "continent of solid stool . . . [but] is totally incontinent of liquid stool and flatus." R. 139. Dr. Berlin's examination revealed that Evans had "diminished sphincter tone," and that "in the anterior commissure of the anal canal there [was] a palpable 'groove' approximately .3-.4 cm in width extending the length of the anal canal. This groove [had] raised edges on either side." R. 139. Dr. Berlin opined that this groove "represent[ed] a segment of absent anal sphincter." R. 139. He surmised that Evans was a healthy female who suffered from anal incontinence as a result of an inadequately repaired laceration of the anal sphincter. R. 139. He opined that her condition required surgical repair in order to "restore [her] normal anal function." R. 139.

While in North Carolina, Evans was treated by Dr. Jackie Newlin and Dr. Richard Saleeby. See R. 140-46, 147-50. On January 16, 1992, Evans was examined by Dr. Newlin who reported that Evans "was becoming incontinent of stool with passage of stool from the vagina." R. 146. She further noted that Evans had "an essentially nonexistent perineal body" and that a "rectovaginal fistula is palpable just to the right of the midline at approximately 7-8 cm up within the vaginal canal." R. 146. Dr. Newlin advised Evans that even if she were to repair the fistula, "complete control may not be achievable" through surgery due "to the possibility of nerve damage that may have occurred during delivery." R. 146.

On January 23, 1992, Dr. Saleeby and Dr. Newlin performed a "sphincterplasty, repair of rectovaginal fistula, perineorrhaphy and internal and external hemmorrhoidectomy" on Evans. R. 144, 148. Dr. Newlin and Dr. Saleeby made the following observations during the procedure:

4

>A small fistula which was approximately 2 mm was noted at the apex of the old episiotomy scar.  There was a 3 cm[ ]defect in the continuity of the external rectal sphincter.  There was also anterior rectal hemorrhoids, both internal and external.

R. 144.  "Once surgery was completed, the external rectal sphincter was felt to be well attached" and the "perineal body was well built up."  R. 145.  On the morning of her discharge, Evans was able to "hold liquid stools."  R. 148.

On February 7, 1992, Evans saw Dr. Jerome Gardner for heavy vaginal bleeding.  R. 143. Dr. Gardner examined Evans and found "no obvious bleeding site."  R. 143.  He increased Evans's dosage of the prescription medication, Provera, and recommended bed rest "until the bleeding slows down."  R. 143.  He also advised Evans to follow up with Dr. Newlin the following week.  R. 143.

On March 5, 1992, Dr. Newlin examined Evans.  R. 142.  She noted that Evans had "good depth in her perineal body" and was "continent of solid stool, [but] incontinent of diarrhea and liquid stool."  R. 142.  Evans stated that since the surgery she was experiencing heavy periods causing her to produce more diarrhea.  See R. 142.  She noted that the prescription medication, Anaprox, helped control her diarrhea.  R. 142.  Dr. Newlin concluded that Evans's IUD was causing her heavy bleeding and advised her to use another form of birth control.  See R. 142.  She also recommended that Evans continue to take Anaprox.  R. 142.  Evans visited Dr. Newlin again on April 30, 1992.  R. 141.  Evans reported that she was still "continent of stool but ha[d] problems when she ha[d] diarrhea."  R. 141.  She also noted that diarrhea occurred when she had her period.  R. 141.  Dr. Newlin conducted a physical examination of Evans which revealed that her "perineal body [was] well healed" and that her cervix was clear.  R. 141. Evans's uterine size was normal with "no palpable adnexal masses."  R. 141.  Dr. Newlin once again noted that she believed that Evans's IUD was causing her diarrhea.  See R. 141.  She

5

recommended that Evans remove her IUD if the diarrhea continued.  R. 141.  On August 26, 1992, Dr. Saleeby performed a "fiberoptic colonoscopy" on Evans.  R. 147.  Dr. Saleeby found no evidence of masses, polyps, or angiodysplastic lesions.  R. 147.

In July 1993, Evans was examined by Dr. John Garbutt, Jr., at the request of Medical Liability Mutual Insurance Company.  R. 153-56.  Evans told Dr. Garbutt that since her surgery, she "no longer passes stool per vagina or flatus but remains incontinent whenever she has diarrhea."  R. 155.  Dr. Garbutt described Evans as "robust," "healthy appearing," "in no distress," "pleasant," and "cooperative."  R. 155.  Dr. Garbutt conducted a rectal examination and observed that "voluntary squeezing of the external sphincter is essentially absent."  R. 154. Dr. Garbutt also performed a manometry, which is used to evaluate incontinence.  See R. 153; Memorandum of Law in Support of the Commissioner's Motion for Judgment on the Pleadings, filed Sept. 17, 2010 (Docket # 10) ("Com. Memo") at 10.  He found that Evans's

> anoinhibilitory reflex [was] intact.  [Her] sensory threshold [was] markedly
> increased at [greater than] 100 ccs.  The capacity is 150 ccs.  The patient is unable
> to perform the Kegel maneuver.  She increases her abdominal pressure which
> actually results in decreased sphincter tone.  The external sphincter strength was
> too low to measure.

R. 153.  His impression was that Evans had "an abnormal anorectal manometry and rectal examination characterized by an absent external sphincter tone and a marked increase in sensory threshold to volume expansion."  R. 151.

Dr. Richard Hausknecht prepared a report at the request of the defendants in Evans's malpractice suit.  After reviewing her medical record, Dr. Hausknecht determined that Evans had "persistent and probably permanent rectal dysfunction."  R. 158.  However, he noted that her records indicated that her condition was "much improved."  R. 158.

Sometime in 1993, Evans moved back to New York.  She met with Dr. Cohen on

October 28, 1993.  R. 161, 170.  At that time, she reported that she was "generally doing well."
R. 161.  She told Dr. Cohen that she had undergone a sphincterplasty in January 1992.  R. 161,
170.  Evans stated that she was "generally very pleased" with the results of the procedure.  R.
161.  She stated that she had "incontinence only with diarrhea" and that besides one accident,
which had occurred two days prior to her visit, she was "moving her bowels well."  R. 170.  She
also noted that she was taking Imodium (an over-the counter medication for diarrhea) because
"her stool tended to be loose."  R. 161, 170.  She stated that she had recently had a colonoscopy
that was negative.  R. 161, 170.  On examination, Dr. Cohen noted that Evans's resting tone was
fair, she had fair squeeze, and that her anus was almost completely closed at rest.  R. 161.  He
recommended that Evans try "Questran to help bind her stools," and advised her "to try Fibercon
tablets . . . to help dry up and bulk her stools."  R. 170; see also R. 161.

In a report dated March 30, 1994, prepared at the request of Evans's attorneys, Dr. Cohen
opined that Evans's condition "should remain relatively stable for many years."  R. 170.  Dr.
Cohen stated that he expected neither improvement nor deterioration in her continence.  R. 170-
71.  He went on to say that her "continence would be more dependent on her bowel habit than on
anything else," and that any pregnancy would put Evans at risk of "decreased anorectial
sphincter muscle tone and . . . incontinence."  R. 171.

Evans did not see Dr. Cohen again until April 3, 1996.  See R. 161, 169.  At this visit,
Evans reported that she was having "multiple loose stools" and that she "must get into the
shower immediately" after a bowel movement or otherwise she would "leak[] all day long."  R.
161.  She further reported that she had a "'couple of accidents'" when her stool was "particularly
loose" and felt that her incontinence may be stress related because her father had recently passed
away.  R. 161.  On examination, Dr. Cohen noted that Evans had no rectal bleeding and that

7

Evans had "fair resting sphincter tone[,] fair squeeze[, and] no masses.  R. 161.  Dr. Cohen also stated that her "autoscopy" came back "essentially negative."  R. 161.  Dr. Cohen recommended that Evans continue taking Imodium, since Evans indicated that it "definitely works," and advised her to avoid doing anything surgically about her incontinence until she was through having children.  R. 169.  He also told Evans to have a physiological sphincter test before contemplating any additional surgeries.  See R. 169.

From 1996-2001, Dr. Weiss continued to treat Evans for various ailments, including sinus problems, hand lesions, sore throats, laryngitis, and nasal congestion.  R. 175-84.  During these visits, Dr. Weiss made no notations regarding Evans's fecal incontinence.  The only note relating to her condition was from June 8, 1996, when Dr. Weiss noted that "a stool sample [was taken] for Dr. Cohen."  R. 182.  On May 9, 1997, Evans delivered her second child by caesarean section.  R. 410.

On May 21, 1998, Evans again visited Dr. Cohen.  R. 169.  She reported that she was still experiencing "some" episodes of incontinence and was taking Imodium, which was helping her symptoms.  R. 169.  Evans told Dr. Cohen that her bowel movements were always "loose."  Dr. Cohen noted that Evans's weight was up.  R. 169.  Evans "deferred" a rectal examination.  R. 169.  On June 2, 1998, Dr. Cohen performed a colonoscopy on Evans, which showed "no evidence of angiodysplasias, neoplasms, polyps," or diverticula.  R. 166.  After her June 2 colonoscopy, Evans did not visit Cohen again until October 28, 2004.  At this time, Evans told Dr. Cohen that she was experiencing three bowel movements per day and frequent leakage.  R. 188.  Evans felt that her bowel movements were abnormal.  R. 186.  Dr. Cohen recommended that Evans have another colonoscopy, R. 186, and scheduled one for her in November, see R. 189.  The colonoscopy was later postponed and never rescheduled.  See R. 186, 189.

8

In December 2004, Dr. Cohen prepared a report describing his treatment of Evans.  In it he provided the following summary of his treatment:

> Ms. Evans' incontinence I think is well described in her history.  This incontinence certainly is secondary to her decreased resting and voluntary anal sphincter tone.  Her incontinence [was] made worse by her loose, frequent stools.  Because of her social and demographic situation, I have not seen Ms. Evans on a regular basis.  As she had already had surgery to repair the sphincter muscles, I have tried to address the loose frequent stools.  The medications that I have recommended have been mostly over-the-counter.  Imodium is essentially one of two medications that will help decrease stool frequency.  The other medication is Lomotil.  Each has a somewhat different mechanism of action.  In Ms. Evans' case, there was no reason to try Lomotil (a prescription medication) as the Imodium was working for her.  I did prescribe Questrian . . . .  In this case, it was being used for its "side effect" of binding the stool.  Finally, I recommended that she take fibercon tablets, (a fiber supplement) without increasing her liquid intake.  My aim here was to again dry out her stool and possibly increase her stool bulk.  The increased bulk would give her more warning that a bowel movement was coming and the drier stool would cause less leakage.  Bulking agents[,] (Fibercon Tablets), "slowing agents"(Imodium and Lomotil) and Questran a binding agent, I believe are the mainstays for the medical treatment of incontinence.

R. 187.

From November 2004 through January 2008, Evans sought treatment from various doctors.  See R. 320-406.  While the doctors' notes indicate that Evans had a history of fecal incontinence, see R. 332, 358, 360, 374, the records do not reflect that Evans complained about her fecal incontinence, see R. 320-406.

Evans began to see Dr. Rose Tamura, a gynecologist in December 2005.  At the request of Evans's counsel in this action, Dr. Tamura completed a "Gastrointestinal Diosorders Functional Capacity Assessment."  See R. 312-19.  In it she diagnosed Evans's condition as "anal sphincter weakness," R. 312, however, she noted that she had not evaluated Evans for this condition, R. 312, 318.  Dr. Tamura did not fill out the majority of the form including the sections which asked for information regarding Evans's symptoms, level of pain, and functional

limitations.  See R. 312-18.  In addition, she noted that she had not prescribed any medications for Evans's condition.  R. 314.

### 2. Non-Medical Evidence

In addition to her medical records, Evans also submitted a letter from her estranged husband, Sevan Boyajian, chronicling the evolution of her condition.  See R. 302-05.  In it, Boyajian describes Evans as a recluse, who refuses to file for disability, and who resists telling strangers about her condition.  R. 303.  He states that when she has an accident, Evans rushes to the shower to clean herself, takes her clothes to the washer to disinfect them, and then returns to the shower to disinfect them with bleach and Lysol.  R. 304.  If Evans is out of the house when an accident occurs, she will also disinfect her car seat cushion.  R. 304.  Boyajian states that Evans has attempted to obtain employment, but each time she secures a position she is let go within weeks.  R. 304.  He further states that Evans pays hundreds of dollars a month in medical bills and does not visit doctors as often as she should because "she either cannot afford it or she does not have the stamina to make a 12-mile drive to the hospital."  R. 305.

Evans also submitted evidence regarding her work history.  See R. 99-108.

### 3. April 3, 2002 Hearing

On April 3, 2002, ALJ Ronald Thomas held a hearing to decide whether Evans's circumstances qualified her for disability benefits.  See R. 192-221.  At the hearing, Evans testified that she was a 43-year-old female who lived with her two children in a rented house.  R. 196.  Her only income came in the form of child support from her children's father.  R. 196.  Evans stated that she attended the State University of New York at Purchase, and that after college she trained to be a paralegal.  R. 197.  Evans worked for IBM from 1981-1991, R. 197, and stopped working "6 weeks before [she] had [her] daughter," R. 198.  At that time, Evans was

still employed with IBM, but was out on maternity leave.  R. 198.  During the course of childbirth, Evans's vagina and rectum were "torn out" when her doctor failed to perform an episiotomy.  See R. 200.  As a result of this alleged malpractice, Evans became incontinent.  See R. 199-200.  She testified that she is unable to control her bowel movements and cannot detect when her body will produce stool.  See R. 199.  Evans wears diapers, but contends that the diaper does not contain her feces, because "[she] is a large person, and the diapers, . . . [are] made usually for . . . urine."  R. 199.  Evans returned to work after developing her condition, but IBM immediately put her on disability because "they couldn't have [her] around other people."  R. 198.  This disability benefit lasted only 18 months.  R. 203.  Evans has not worked since she left IBM.  See R. 199.  Evans underwent surgery in order to rectify the problem.  R. 200.  While the doctors were able to rebuild the wall between her vagina and rectum, they were unable to do anything about her sphincter, "other than reconnect it."  R. 200.  Evans stated that after her surgery, she was not put on prescription medication because her doctors felt it was best for her to use Imodium until her condition worsened.  R. 201.

During the hearing, Evans described her daily routine.  R. 202-03.  On a typical day, Evans takes care of her two children.  R. 202.  At that time, her daughter went to school, but her son stayed home with her.  R. 202.  She testified that since she was a single parent, she was responsible for "anything that ha[d] to be done."  R. 202.  She did all the shopping, cleaning, and cooking for the household.  R. 202.  When her condition is bad, Evans testified that she has to take six to seven showers a day to clean herself.  R. 202, 204.  Evans does not know when her condition will act up, R. 205, and her condition can flare up any time of day, R. 209.  Often she cannot feel when she needs to use the restroom.  R. 205.  Evans stated that she does not leave her house unless she has to, R. 202, but is able to visit family in New York from time to time.  R.

11

203.

Evans testified that she is unable to work even if the job were mostly sedentary, because she is unable to control her bowels.  R. 203-04.  Evans stated that if she knows she has to be somewhere she will abstain from eating and will take medication in an attempt to try to control her condition.  See R. 204-05.  Evans testified that in order to attend the hearing, she had to take six pills and abstain from eating.  See R. 204.  Evans has also made dietary adjustments.  See R. 205.  However, even with these precautions, Evans still has issues with her bowels.  R. 205.  "Stress, tension, alcohol, spicy food, coughing," and lifting worsen her bowel movements.  R. 207.  If Evans has a cold, her bowel movements are "generally 9 times worse."  R. 207.  She only has "one to two normal days" a month, which she defined as a day where she did not move her bowels.  R. 206.  Evans stated that prescription medications are available to treat her condition, but that Dr. Cohen does not want her to take them until her condition becomes "unbearable."  R. 218.  Evans did not ask Dr. Cohen to place her on prescription medication.  See R. 201-18.  Evans's doctors also recommended that Evans have a colostomy but she does not want to do that because of the risks associated with the procedure.  R. 206

Dr. Timothy Freedman, a medical expert for the Social Security Administration ("SSA"), testified that Evans "suffered an anal sphincter laceration, during a vaginal delivery, in February of 1991.  And subsequently, had a repair of a rectal sphincter, and a rectal vaginal fistula, in January[] of 1992."  R. 209.  Dr. Freedman stated that after her 1992 surgery, Evans's medical history indicates that "there had been some incontinen[ce], but, . . . it doesn't seem to be a major problem."  R. 210.  He noted that Evans's records from Dr. Weiss, "from February of '96 to May of 2001, ma[de] no mention of incontinence."  See R. 210.  Evans stated that the reason Dr. Weiss's notes failed to mention her condition was because he was not treating her for her

incontinence.  R. 210.  When she had issues with her bowels, she would see Dr. Cohen.  R. 210.

Dr. Freedman responded that even Dr. Cohen's notations indicate that Evans's condition is not

serious.  R. 211.  Dr. Freedman stated that "the record from Dr. [Cohen] mentioned

incontinence, as a problem, but at least, in terms of the way he refers to it, it doesn't seem to be a

major problem, by what he writes down."  R. 211.  Dr. Freedman opined that if the claimant was

being truthful, "then she clearly[] is disabled," R. 212, analogizing her condition to Section 5.07

in the Listing of Impairments, see R. 212-13.  Dr. Freedman further noted, however, that there

was no "objective evidence in the record, that what [Evans] reports is in fact the truth."  R. 212.

Upon further questioning by Evans's counsel, Dr. Freedman admitted that Evans's condition is

consistent with the findings of a manometry test, but notes that this test is not diagnostic and

merely a clinical finding.  R. 216.

 The ALJ issued his opinion on June 28, 2002, ruling that Evans did not qualify for

disability benefits because she is not disabled within the meaning of the Social Security Act.  R.

68-75.

 Evans filed a request for review with the Appeals Council on July 3, 2002.  R. 76.  The

Appeals Council granted Evans's request and remanded the case to the ALJ for an additional

hearing.  R. 83-84.  In their order for remand, the Appeals Council found that the ALJ ignored a

portion of Dr. Freedman's testimony, particularly the section where Dr. Freedman stated that "if

the claimant was being truthful, she was disabled," and that her incontinence was equivalent to

Section 5.07 in the Listing of Impairments.  R. 83.

4.  May 6, 2005 Hearing

 After the Appeals Council remand, an additional hearing was held on May 6, 2005.

R. 222-35.  Once again, Evans appeared with counsel.  See R. 222.  Medical expert Dr. Thomas

Weiss (not to be confused with Dr. David Weiss) also provided testimony.  R. 229-35.  During the hearing, Evans reaffirmed her April 3, 2002 testimony, see R. 225-26, noting that she "had said it all in the last hearing."  R. 226.

After listening to a tape of the April 3 hearing, Dr. Thomas Weiss testified.  R. 229-35.  He stated that Evans's major impairment was "intractable diarrhea," and her inability to control her diarrhea.  R. 230.  He further testified that Evans had "fecal incontinence with [ ] liquid stool, as well as . . . flatus or gaseous material."  R. 230.  He opined that Evans's condition did not meet or equal any listing due to the fact that Evans had no history of weight loss or vitamin deficiency.  R. 230-31.  He was unable to form an opinion on Evans's residual functional capacity, because he was not provided with specific documentation regarding Evans's "ability to sit, stand or walk, . . . carry or lift objects of varying weights, and ability to perform postural activities or exertional activities."  R. 231.  In addition, Dr. Thomas Weiss noted that while Lomotil was available, Evans was not prescribed Lomotil by her doctors.  R. 232.  Instead, she took Imodium to control her symptoms.  R. 232.  While Dr. Thomas Weiss opined that Evans's impairment was not equivalent to any section in the listing of impairments, he testified that she would be unable to work on a sustained basis in a sit down job if she "had to run to the bathroom all the time."  R. 231.

On June 15, 2006, the ALJ issued a decision ruling that Evans was not entitled to disability benefits.  R. 11-18.  Evans filed a request for review with the Appeals Council, which denied her request.  R. 3-5.  Evans then filed a civil action seeking review of the Commissioner's final decision.  See R. 254-57.  The parties agreed to a remand.  R. 255-57.  In an order dated May 17, 2007, the Appeals Council remanded the matter to the ALJ, stating the record was devoid of vocational evidence "regarding the extent to which the claimant's limitations erode the

occupational base for sedentary work at either step of the sequential evaluation."  R. 260.

     5.    April 24, 2008 Hearing

On April 24, 2008, a third hearing was held.  Evans attended the hearing and was represented by counsel.  See R. 407.  In addition, the court heard testimony from Amy Leopold, a vocational expert.  R. 422-27.  During the hearing, Evans provided the court with more testimony regarding her condition.  She stated that if she did not shower immediately after an accident, "the feces would keep coming," she would smell, and she would experience pain. R. 412.  On average, Evans stated that she showers six to eight times a day and changes her diaper three to four times a day.  R. 424-25.  Evans stated that she has accidents on a daily basis and if she is lucky, she will have one or two good days a week.  R. 413, 424.  Evans's only alterative to showers is to use wipes; but if her accident is bad, the only method that solves the problem completely is a shower.  See R. 412-13.  Evans reaffirmed that she cannot predict when she will have an accident.  See R. 416.  The only time she has any warning is when she is "sick with diarrhea and [ ] get[s] stomach cramps."  R. 416.  If she does not have diarrhea then she is not able to tell when she needs to use the restroom.  See R. 416.

Additionally, Evans provided testimony about her work experience.  She stated that prior to developing her condition, she had worked her "whole life, 20 years."  R. 421.  Evans testified that since developing her condition, she has had three jobs, but that "they all lasted two, three days until [she had an accident]," and was subsequently laid off.  R. 414.

Leopold, the vocational expert, testified that Evans had no exertional limitations and that she was physically capable of performing the essential functions and duties of an administrative assistant but implied that her ability to perform work would depend on the amount of time she

had to spend in the bathroom.  See R. 426.  Leopold also opined that if Evans needed to be near

shower facilities, "she couldn't [perform] her past relevant work," or any other work.  R. 427.

      6.    March 26, 2009 ALJ Decision

On March 26, 2009, ALJ Reaps issued an opinion denying Evans's request for disability

benefits.  His findings of fact and conclusions of law are as follows:

> 1.  The claimant met the disability insured status requirements of the Social
> Security Act on February 18, 1991, the date she stated she became unable to
> work, and continued to meet them through December 31, 1997, but not thereafter.
>
> 2.  The claimant did not engage in any substantial gainful activity after February
> 18, 1991. . . .
>
> 3.  During the pertinent period February 18, 1991 through December 31, 1997,
> the claimant had the following "severe" impairment: anal nerve damage and
> laceration of the sphincter muscles after giving birth in February 1991 which
> required surgical repair and which left the claimant with residual fecal
> incontinence (20 CFR § 404.1521 et seq.). . . .
>
> 4.  Through the date last insured, the claimant did not have an impairment or
> combination of impairments that met or medically equaled one of the listed
> impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR §§ 404.1525
> and 404.1526). . . .
>
> 5.  During the pertinent period February 18, 1991 through December 31, 1997,
> the claimant had the residual functional capacity to perform a full range of work
> at all exertional levels but with the following nonexertional limitations: wear
> adult diapers as needed and be near a bathroom to be used as needed.  I do not
> accept as credible testimony from claimant that she must be able to shower
> frequently at work. . . .
>
> 6.  Through the date last insured, the claimant was capable of performing her past
> relevant work as an administrative assistant.  This work did not require the
> performance of work-related activities precluded by the claimant's residual
> functional capacity (20 CFR § 404.1565). . . .
>
> 7.  The claimant was not under a "disability," as defined in the Social Security
> Act, at any time from February 18, 1991, the alleged disability onset date, through
> December 31, 1997, the date last insured (20 CFR § 404.1520(f)).  It is long past
> the time to bring closure to this case.

R. 244-53.  With regard to point three, the ALJ found that the medical evidence established that Evans's impairment was severe within the meaning of the regulations, see R. 248, and that there was no evidence in the record to establish the existence of any other severe impairment.  R. 428. While the record indicated that Evans suffered from depression and anxiety, it contained "no mental status evaluations that set forth abnormalities likely to give rise to any psychiatric functional limitations," nor was there any "indication[] that the claimant received any form of therapy or treatment from a mental health professional . . . ."  R. 248.

Under point four, the ALJ relied substantially on the opinions of Dr. Freedman and Dr. Thomas Weiss, finding that both doctors testified that Evans's condition did not prevent her from working.  See R. 249.  The ALJ emphasized Dr. Freedman's testimony regarding Evans's use of Imodium to treat her symptoms, as well as Dr. Freedman's statements regarding the medical record and the little mention of Evans's condition by her doctors.  R. 249.  While the ALJ noted Dr. Freedman's testimony that if Evans's testimony were true regarding her condition she would qualify for disability benefits, he states that Dr. Freedman's statements were undermined by the testimony of Dr. Thomas Weiss who "did not place any such contingencies on his testimony."  R. 429.  Instead, Dr. Weiss's testimony made clear that Evans's impairment did not meet any criteria set forth in the Listing of Impairments.  R. 429.

In making his determination regarding point five, the ALJ utilized a two-step analysis. The first step required the ALJ to determine "whether there [was] an underlying medically determinable physical or mental impairment . . . that could reasonably be expected to produce the claimant's pain or other symptoms."  R. 250.  The ALJ found that Evans's impairment could reasonably be expected to cause the alleged symptoms, but that Evans's testimony regarding the frequency and intensity of her symptoms was not credible.  R. 250.  In making this finding, the

ALJ relied primarily on the lack of evidence in the medical records supporting her complaints, as well as Evans's own testimony regarding her daily activities.  R. 250-51.  The ALJ also noted Boyajian's letter but dismissed it as being "self-serving and not backed up by objective evidence."  R. 251.

In making his determination under point six, the ALJ relied on Leopold's and Evans's testimony, in particular Leopold's statements that a similar person with Evans's condition could perform the job of an administrative assistant provided her work was not affected by constant and/or extended trips to the restroom.  R. 252.  He determined that Evans would have to devote 30-40 minutes per day to changing her diaper and found that this amount of time "would not significantly erode her occupational base."  R. 252.  Because of this, the ALJ found that Evans was capable of performing "her past relevant work both as she performed it and as generally performed in the national economy."  R. 252.  He further opined that there was no conflict between Leopold's testimony and the "information contained in the DOT and the Selected Characteristics of Occupations (Social Security Ruling 00-4p)."  R. 252.

Evans again appealed the ALJ's denial, but her appeal was denied.  R. 236-38

## II.    DISCUSSION

### A.    Scope of Judicial Review under 42 U.S.C. § 405(g)

A court reviewing a final decision by the Commissioner must determine whether the Commissioner has applied the correct legal standard and whether the decision is supported by substantial evidence.  See, e.g., Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008); Acierno v. Barnhart, 475 F.3d 77, 80-81 (2d Cir.) (citing Pollard v. Halter, 377 F.3d 183, 188 (2d Cir. 2004)) (additional citation omitted), cert. denied, 551 U.S. 1132 (2007); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); see generally 42 U.S.C. § 405(g) ("The findings of the

Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); accord Burgess, 537 F.3d at 127-28; Matthews v. Leavitt, 452 F.3d 145, 152 n.9 (2d Cir. 2006); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).

"Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotation marks omitted). Thus, "[i]f the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists." Johnson v. Astrue, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder.")). "The role of the reviewing court is therefore quite limited and substantial deference is to be afforded the Commissioner's decision." Johnson, 563 F. Supp. 2d at 454 (citations and internal quotation marks omitted). The reviewing court may not substitute its judgment for that of the Commissioner; further, it may reverse the administrative determination "only when it does not rest on adequate findings sustained by evidence having 'rational probative force.'" Williams ex rel. Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988) (quoting Consol. Edison Co., 305 U.S. at 230).

      B.     Standard Governing Evaluations of Disability Claims by the Agency

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  A person will be found to be disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . ."  42 U.S.C. § 423(d)(2)(A).

To evaluate a Social Security claim, the Commissioner is required to examine: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience."  Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam) (citations omitted).

Regulations issued pursuant to the Social Security Act set forth a five-step process that the Commissioner must use in evaluating a disability claim.  See 20 C.F.R. § 404.1520(a)(4); see also Burgess, 537 F.3d at 120 (describing the five-step process).  First, the Commissioner must determine whether the claimant is currently engaged in any "substantial gainful activity."  20 C.F.R. § 404.1520(a)(4)(I).  Second, if the claimant is not engaged in substantial gainful activity, the Commissioner must decide if the claimant has a "severe medically determinable physical or mental impairment," 20 C.F.R. § 404.1520(a)(4)(ii), which is an impairment or combination of impairments that "significantly limits [the claimant's] physical or mental ability to do basic work activities . . . ."  20 C.F.R. § 404.1520(c).  Third, if the claimant's impairment is severe and is listed in 20 C.F.R. Part 404, Subpt. P, App. 1, or is equivalent to one of the listed impairments,

the claimant must be found disabled regardless of his age, education, or work experience.  20

C.F.R. § 404.1520(a)(4)(iii).  Fourth, if the claimant's impairment is not listed and is not equal to

one of the listed impairments, the Commissioner must review the claimant's residual functional

capacity to determine if the claimant is able to do work he or she has done in the past, i.e., "past

relevant work."  20 C.F.R. § 404.1520(a)(4)(iv).  If the claimant is able to do such work, he or

she is not disabled.  Id.  Finally, if the claimant is unable to perform past relevant work, the

Commissioner must decide if the claimant's residual functional capacity permits the claimant to

do other work.  20 C.F.R. § 404.1520(a)(4)(v).  If the claimant cannot perform other work, he or

she will be deemed disabled.  Id.  The claimant bears the burden of proof on all steps except the

final one – that is, proving that there is other work the claimant can perform.  See Poupore v.

Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

> C.    Determination of Credibility

The Second Circuit has held that where an ALJ rejects witness testimony as not credible,

the basis for the finding "must . . . be set forth with sufficient specificity to permit intelligible

plenary review of the record."  Willams, 859 F.2d at 260-61 (citing Carroll v. Sec'y of Health &

Human Servs., 705 F.2d 638, 643 (2d Cir. 1983)); accord Snell v. Apfel, 177 F.3d 128, 135 (2d

Cir. 1999).  The ALJ must make this determination "in light of medical findings and other

evidence[ ] regarding the true extent of the" symptom alleged.  Mimms v. Heckler, 750 F.2d

180, 186 (2d Cir. 1984) (quoting McLaughlin v. Sec'y of Health, Educ. & Welfare, 612 F.2d

701, 705 (2d Cir. 1980)).

The SSA has issued a regulation relating to reports of pain or other symptoms by a

claimant for disability benefits.  See 20 C.F.R. § 416.929(c).  This regulation provides, inter alia,

that the SSA "will not reject [a claimant's] statements about the intensity and persistence of [her]

pain or other symptoms or about the effect [her] symptoms have on [her] ability to work . . .

solely because the available objective medical evidence does not substantiate [her] statements."

20 C.F.R. § 416.929(c)(2).  The regulations also provide that the SSA "will consider whether

there are any inconsistencies in the evidence and the extent to which there are any conflicts

between [her] statements and the rest of the evidence . . . ."  20 C.F.R. § 416.929(c)(4).

     The SSA has also issued an agency ruling on assessing the credibility of individual

statements in agency adjudications.  <u>See</u> SSR 96-7p, 1996 WL 374186, at *3 (S.S.A. July 2,

1996).  The ruling states:

> In recognition of the fact that an individual's symptoms can sometimes suggest a
> greater level of severity of impairment than can be shown by the objective
> medical evidence alone, 20 C.F.R. 404.1529(c) and 416.929(c) describe the kinds
> of evidence, including the factors below, that the adjudicator must consider in
> addition to the objective medical evidence when assessing the credibility of an
> individual's statements:
>
> > 1. The individual's daily activities;
> >
> > 2. The location, duration, frequency, and intensity of the
> > individual's pain or other symptoms;
> >
> > 3. Factors that precipitate and aggravate the symptoms;
> >
> > 4. The type, dosage, effectiveness, and side effects of any
> > medication the individual takes or has taken to alleviate pain or
> > other symptoms;
> >
> > 5. Treatment, other than medication, the individual receives or has
> > received for relief of pain or other symptoms;
> >
> > 6. Any measures other than treatment the individual uses or has
> > used to relieve pain or other symptoms (e.g., lying flat on his or
> > her back, standing for 15 to 20 minutes every hour, or sleeping on
> > a board); and
> >
> > 7. Any other factors concerning the individual's functional
> > limitations and restrictions due to pain or other symptoms.

Id.; see generally Osborne v. Astrue, 2010 WL 2735712, at *8 (N.D.N.Y. July 9, 2010)

("[E]vidence falling into any of these categories could be substantial and sufficient to support a

finding that a claimant's testimony regarding pain and other symptoms was not credible.").

"Additionally, the ALJ should examine the claimant's internal consistency and may consider

personal observations as long as they are part of a larger overall evaluation."  Peña v. Astrue,

2008 WL 5111317, at *11 (S.D.N.Y. Dec. 3, 2008) (citing SSR 96-7p, 1996 WL 374186, at *5,

8).

      D.    Analysis

Evans challenges the ALJ's conclusion that she was not fully truthful at the hearing

regarding the frequency of episodes of fecal incontinence she experiences.  The ALJ's decision

points to evidence that potentially supports this conclusion – for example, Dr. Cohen's notes in

1993 indicating that Evans was "doing well and was generally very pleased with the results of

her surgery," and that she had only "some episodes of incontinence."  R. 248; see R. 161.  But it

relies most heavily on the absence of evidence: in particular, the fact that Dr. Weiss's notations

were devoid of any reference to Evans's severe bowel problems.  R. 249.  Indeed, the ALJ's

decision states that "[t]he most compelling feature in this case is the lack of medical treatment."

R. 250.  Essentially, the ALJ concluded that Evans was not truthful about the extent of her

incontinence because she did not complain about the condition during the relevant period.  The

ALJ's reliance on the absence of complaints to support his credibility determination was not per

se improper as it is reasonable to infer that Evans's complaints about incontinence – at least to

the degree she described in her testimony – would have been the subject of some discussion with

doctors.  But the case must be remanded in any event.

23

The ALJ did not conclude that Evans was wholly incredible, but rather found that she was required to change her diapers three to four times a day.  R. 252.  Based on this finding, he made an "estimation" that it would take "approximately 10 minutes" to change the diapers for each episode.  He concluded that the total of 30-40 minutes per day required for these changes "would not significantly erode [Evans's] occupational base . . . . "  R. 252.  These findings, however, are unsupported by substantial evidence.  On the question of how long it took for Evans to clean up after episodes of incontinence, there appears to be no testimony on this point. Indeed, the only testimony in the record was that Evans could only clean herself through showering.  R. 202, 204, 304, 412-13, 424; see also R. 161 (reporting to Dr. Cohen that she needed to shower immediately after a bowel movement).  To the extent the ALJ was making an implicit finding that showering was not necessary, this finding too is not explained or supported by any description of Evans's required clean-up procedures.

On the question of whether Evans's episodes of clean-up during the workday would affect her employability, there was similarly a lack of substantial evidence to support the ALJ's findings.  To the extent the ALJ believed a shower was required, the vocational expert testified unequivocally that Evans could not do her past relevant work if she needed to be near a shower. R. 427.  To the extent the ALJ found that Evans would require three to four breaks of 10 minutes each with the availability of normal toilet facilities, this scenario was not presented at all to the vocational expert.  Thus, the vocational expert was never asked any questions regarding whether three to four daily unannounced 10 minute breaks would affect Evans's employability.  And, of course, as described above, there was no record regarding the actual length of time that Evans would require to clean herself up.

24

The ALJ's failure to raise this issue with the vocational expert was raised by Evans in her motion papers, Pl. Memo at 8-9, but the Commissioner filed no papers in response.  Nor was the point discussed in the Commissioner's memorandum of law in support of his own motion.

*        *        *

The Court concludes that the Commissioner's decision was not supported by substantial evidence as described above.

III.   <u>CONCLUSION</u>

The Commissioner's motion for judgment on the pleadings is denied and Evans's motion for judgment on the pleadings is granted.  The case is remanded for further proceedings consistent with this Opinion and Order.  The Clerk is requested to enter judgment.

Dated: April 28, 2011
       New York, New York

_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge

Copies sent to:

Lewis Bart Insler
Insler & Hermann, LLP
80 Grasslands Road, Suite 102
Elmsford , NY 10523

Susan D. Baird
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, NY 10007

25

The ALJ's failure to raise this issue with the vocational expert was raised by Evans in her motion papers, Pl. Memo at 8-9, but the Commissioner filed no papers in response. Nor was the point discussed in the Commissioner's memorandum of law in support of his own motion.


*       *       *

The Court concludes that the Commissioner's decision was not supported by substantial evidence as described above.

III.    CONCLUSION

The Commissioner's motion for judgment on the pleadings is denied and Evans's motion for judgment on the pleadings is granted. The case is remanded for further proceedings consistent with this Opinion and Order. The Clerk is requested to enter judgment.

Dated: April 28, 2011
       New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge


Copies sent to:

Lewis Bart Insler
Insler & Hermann, LLP
80 Grasslands Road, Suite 102
Elmsford , NY 10523

Susan D. Baird
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, NY 10007

25